IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION


VIVIAN SKOVGARD, *et al.*,                    :

    Plaintiffs,                    :

                              Case No. 3:08cv071

        vs.                    :

                              JUDGE WALTER HERBERT RICE

P.O. JEFF PEDRO, *et al.*,                    :

    Defendants.                    :

---

DECISION AND ENTRY SUSTAINING MOTION FOR SUMMARY
JUDGMENT (DOC. #12) BY DEFENDANTS PEDRO, MANNIX AND
CITY OF KETTERING; JUDGMENT TO ULTIMATELY ENTER IN FAVOR
OF DEFENDANTS PEDRO, MANNIX AND CITY OF KETTERING AND
AGAINST PLAINTIFFS; DIRECTIONS TO PLAINTIFFS

---

Plaintiffs Vivian Skovgard and Percy J. Gros, Jr. are long-time pro-life

advocates, whose activities outside of the Women's Med+ Center (the "Center"),

an abortion clinic in Kettering, Ohio, include counseling, praying, picketing and

distributing literature.  On March 2, 2007, the Center's security guard, Defendant

Alex Kaminski (who was employed by Defendant 1st Choice Security, Inc. ("1st

Choice"), called Defendant City of Kettering's[1] police department to report that

---

    [1]The Plaintiffs originally filed separate suits against Defendants Pedro,
Mannix, 1st Choice Security, Inc. and Kaminski (case number 3:08cv071) and

Skovgard and Gros were trespassing on the Center's property, although they were actually in the public right-of-way adjacent to the property. Defendant police officers Jeff Pedro and Mike Mannix arrived at the scene and, despite the protestations of Skovgard and Gros that they were in the public right-of-way, handcuffed and arrested them for criminal trespass. The City of Kettering eventually dismissed the criminal trespass charges when it was confirmed that Skovgard and Gros were, in fact, in the public right-of-way.

Skovgard and Gros brought suit against Pedro, Mannix, 1st Choice and Kaminski, alleging that they are liable for the following: (1) warrantless, unreasonable and unconstitutional seizure and detention, in violation of the Fourth Amendment; (2) deprivation of freedoms of speech and assembly, in violation of the First Amendment, and retaliation for the exercise of speech; (3) deprivation of liberty without due process of law, in violation of the Fifth and Fourteenth Amendments; (4) false arrest and false imprisonment, in violation of Ohio common law; and (5) malicious prosecution, in violation of Ohio common law. Doc. #1. The Plaintiffs also allege that the City of Kettering is liable to them for the following: (1) inadequate training and/or failure to discipline its police officers, which caused the unlawful arrests in violation of the Fourth Amendment; (2) inadequate training and/or failure to discipline its police officers, which caused the deprivations of the

---

against Defendant City of Kettering (case number 3:09cv082), as a result of the same incident. On April 9, 2009, the Court sustained a Motion to consolidate the two cases, administratively processed case number 3:09cv082 and ordered that all future filings be made in case 3:08cv071. Doc. #6.

freedoms of speech and assembly, in violation of the First Amendment, and also constituted retaliation for the exercise of the freedom of speech; and (3) inadequate training and/or failure to discipline its police officers, which caused the deprivation of liberty without due process of law, in violation of the Fifth and Fourteenth Amendments. Doc. #1 (case #3:09cv082).

Defendants City of Kettering, Pedro and Mannix have moved for summary judgment on all claims against them. Doc. #12. The Court will proceed with a review of the pertinent facts and then turn to a consideration of the merits of the Motion for Summary Judgment.

I.    Facts[2]

   A.    Background on the Center, Kaminski, Skovgard and Gros

The Center is surrounded on three sides by roadways. Doc. #15-7. To the south is Stroop Road, which presently has a sidewalk, but has not always had such. Id.; Doc. #15 at 9 (Gros Dep. at 30). To the west is Vineyard Avenue, which has had a sidewalk at all times relevant to this litigation. Doc. #15-7. To the north is Wheatland Avenue (the location of the incidents in question in this litigation),

---

[2]Since this case comes before the Court on the Defendants' Motion for Summary Judgment, the Court sets forth the facts and circumstances giving rise to such Motion in the manner most favorable to the Plaintiffs, as the parties against whom the Motion is directed. Servo Kinetics, Inc. v. Tokyo Precision Instruments, 475 F.3d 783, 790 (6th Cir. 2007).

which does not have a sidewalk. Id.  In the grassy area along Wheatland Avenue, there is a fire hydrant. Doc. #15 at 11 (Gros Dep. at 40).  Pedestrians sometimes walk on that grassy area to avoid traffic on the street. Id. (Gros Dep. at 41).

1st Choice provided security services for the Center, and, assigned Alex Kaminski as a security guard to the Center, in January 2007. Doc. #16 at 8 (Kaminski Dep. at 27).  The Center (which is not a party in this litigation) never advised Kaminski of the extent of its property or the existence of a public right-of-way along the northern portion of the property that abuts Wheatland Avenue. Id. at 10 (Kaminski Dep. at 35).

Plaintiff Vivian Skovgard has been praying, protesting and attempting to counsel women outside of the Center four days a week for approximately six hours a day, since 1989. Doc. #21 at 4, 9 (Skovgard Dep. at 10, 30-33).  In so doing, she sometimes walks along the grass on Wheatland Avenue, staying within three to four feet of the roadway. Id. at 3-4 (Skovgard Dep. at 9-11).  Skovgard was arrested numerous times, between 1989 and 1995, in various parts of the country (including Alabama, Kansas and Texas) and convicted of criminal trespass in some instances, as a result of blocking access to various abortion clinics. Id. at 4-8 (Skovgard Dep. at 13-27).  However, her only confrontation with police at the Kettering Center was in "two thousand something" when she was either detained or arrested (and then released) for trespassing when she walked on the Center's driveway to hand literature to a person leaving the facility in a car. Id. at 8

(Skovgard Dep. at 27-29).

Plaintiff Percy Gros has been regularly protesting and praying at the Center since 1987. Doc. #15 at 8 (Gros Dep. at 27). In so doing, he walked in the grass along Stroop Road (before a sidewalk was added) and has also walked in the grass along Wheatland Avenue "many, many times". Id. at 9 (Gros Dep. at 30-33). When walking along Wheatland Avenue, Gros always stays within a couple of feet of the roadway. Id. at 11 (Gros Dep. at 41). During the twenty year period that he has been present at the Center, the police have occasionally been to the Center while Gros was there, but had never indicated to Gros that he was not allowed to walk on the grass along Wheatland Avenue, prior to the incident on March 2, 2007. Id. at 11 (Gros Dep. at 39). Gros was arrested twice in 1987, once at the Center and once at another abortion clinic in Dayton, Ohio, and convicted both times for disturbing the peace. Id. at 5 (Gros Dep. at 15-16).


B.     Incident at Center on March 2, 2007

On March 2, 2007, Skovgard arrived at the Center around 9:30 a.m. and spent most of her time on the sidewalk along Vineyard Avenue, prior to Gros's arrival. Doc. #21 at 16 (Skovgard Dep. at 58-60). When Gros arrived, he walked in the grassy area along Wheatland Avenue, staying within three feet of the road. Doc. #15 at 12 (Gros Dep. at 42). Kaminski soon approached Gros with a threat to call the police if Gros did not get off the grass. Id. at 15 (Gros Dep. at 54).

5

When Gros ignored him, Kaminski leaned into Gros, making physical contact with him, and then accused Gros of assaulting him. Id. (Gros Dep. at 54-55). Gros reacted by continuing to walk as before, while Kaminski went into the Center to call the police department to report that Gros and Skovgard were trespassing and to retrieve a video camera. Id. (Gros Dep. at 56-57); Doc. #20-2 (Mannix's Arrest Rpt.) (indicating receipt of report of trespassers). Skovgard then joined Gros, walking along the grassy area on Wheatland Avenue. Doc. #15 at 15 (Gros Dep. at 57).

Officers Pedro and Mannix arrived soon thereafter and initially spoke with Kaminski. Id. at 16 (Gros Dep. at 59-61). Kaminski advised the officers that he had asked Gros and Skovgard to leave the Center's property on the grassy area on the north side of the clinic, but they had refused. Doc. #20 at 7 (Pedro Dep. at 22-23). Kaminski also informed them that the Center wanted Gros and Skovgard off the grass and back onto the sidewalk to conduct their protests. Id. (Pedro Dep. at 25). According to Pedro, at this time Gros was fifteen feet off of Wheatland Avenue, while, at his deposition, Mannix testified that Gros and Skovgard were approximately ten feet into the grassy area when he arrived. Doc. #19 at 5 (Mannix Dep. at 13); Doc. #20 at 8 (Pedro Dep. at 29). (This is in contradiction to the testimony of Gros and Skovgard who stated that they always stay within three to four feet (or a couple of feet) of the roadway.) The officers believed that the edge

of the roadway marked the Center's property line.[3] Doc. #19 at 5-6 (Mannix Dep. at 17-18); Doc. #20 at 8 (Pedro Dep. at 27). The officers several times told Gros and Skovgard that they needed to get off the grass and encouraged them to continue their protests on the sidewalk, but Gros and Skovgard continued walking in the grass. Doc. #15 at 17 (Gros Dep. at 62-63); Doc. #20 at 9 (Pedro Dep. at 33). The officers then stated that they would arrest Gros and Skovgard if they did not get off the grass, at which time both Gros and Skovgard told the officers that they did not have to get off the grass because it was public right-of-way. Doc. #15 at 17 (Gros Dep. at 64); Doc. #19 at 8 (Mannix Dep. at 26-27). Gros also mentioned that they had been protesting on that property for over twenty years and had never been harassed by the police before. Doc. #15 at 17 (Gros Dep. at 65). Nevertheless, the officers handcuffed and arrested Gros and Skovgard for criminal trespass, transporting them to the police station and detaining them in the City jail. Id. at 18-19 (Gros Dep. at 69-73); Doc. #16, Exs. C, D (Criminal Complaints).

Ultimately, the charges were dismissed against Gros and Skovgard when it was determined that they were protesting within the public right-of-way. Doc. #15 at 23 (Gros Dep. at 88). The public right-of-way on Wheatland Avenue extends 25

---

[3]When asked why he assumed that the Center's property line was at the edge of the street, Pedro testified that "all of my prior understanding and training told me that basically property is property. If . . . a person's property is basically the established property line, that the edge of the grass leading up to the sidewalk and everything inside that is their property." Doc. #20 at 8 (Pedro Dep. at 27).

feet from the centerline of the road. Doc. #15-9 (Plat Map) at 2.  It is unclear how

wide the road is or how many feet the right-of-way extends into the grassy area

along Wheatland Avenue.[4]  According to the Kettering City Engineer, fire hydrants

are always located in public rights-of-way. Doc. #15 at 23 (Gros Dep. at 86).


C.     <u>Facts Pertaining to Municipal Liability</u>

At his deposition, Lieutenant Knickle, of the Kettering Police Department,

testified that Pedro and Mannix acted in accordance with the City's policies,

procedures and training, in the course of the arrests of Gros and Skovgard, on

March 2, 2007. Doc. #18 at 6 (Knickle Dep. at 19).  Knickle is familiar with the

history of the regular presence of protestors at the Center, including a mass protest

in the early 1990s, where large groups blocked the door of the Center and the

police made arrests for criminal trespass. <u>Id.</u> at 3-5 (Knickle Dep. at 9-14).  Prior to

the incident involving Gros and Skovgard, in 2007, however, the City did not

provide any training to its officers regrading how to identify or handle trespass

issues at the Center. <u>Id.</u> at 5 (Knickle Dep. at 14-15).  After acknowledging that

---

[4]A hand-sketched drawing from the Kettering City Engineer indicates that the
right-of-way extends approximately 14.5 feet into the grassy area on either side of
Wheatland Avenue. Doc. #15-9 at 1.  However, Gros testifies that the City
Engineer did not know how wide the street was, when he prepared the sketch
(Doc. #15 at 23 (Gros Dep. at 86)), so the numbers on the sketch would appear to
be estimates.  The Plaintiffs also point to photographs contained in the record,
which were taken in the course of a survey of the property, but there is no
indication in the photographs of how many feet the right-of-way extends into the
grass. Doc. #24 (citing Exhibits D and E to Document #15).

protestors were arrested for criminal trespass, during the mass protest at the Center in the early 1990s, Knickle was questioned about training with regard to trespass issues. A pertinent part of his deposition reads:

> Q    Okay. So it's fair to say that dating back say - - at least say to the 1990s which is when I know a lot of that activity happened, criminal trespass was a charge that the - - or situation that the police and the Kettering courts had to deal with?
>
> A    Correct.
>
> Q    And do you recall any specific training that the [C]ity of Kettering ever gave to the police officers dealing with trespass issues at that clinic? For example, where are the property lines, where are the protesters allowed to walk, where can't they walk. Sometimes there [are] sidewalks along some side of the clinic. Other side of the clinic, there are no sidewalks. I've just thrown a lot at you but do you recall any kind of training to address that location in particular with the history of protest then?
>
> A    Prior to this incident in 2007, no.

Id. at 5 (Knickle Dep. at 14-15). Lieutenant Knickle testified that, although the City did not conduct any training specific to trespass issues at the Center, it had conducted training specific to the Center on the "logistics of how we were going to respond if we were required to make mass arrests and - - specifically, you know, what the logistics would be if we brought in buses and the use of flex cuffs versus regular handcuffs and how we would process personnel." Id. at 4 (Knickle Dep. at 10).

Pedro confirms Knickle's testimony in stating that, prior to the incident in March 2007, he never received any training or instruction about how to handle

9

protestors at the Center, except on the occasion of the mass protest in the early 1990s when the City instructed him on how to handle the unique aspects of that anticipated event. Doc. #20 at 5-6 (Pedro Dep. at 14-20). He also received no training or instruction about the property lines or public right-of-way around the Center. Id. (Pedro Dep. at 17-18). Likewise, Mannix had received no training regarding public rights-of-way or property lines, or any training pertaining to handling issues specific to the Center, with the exception of the instructions pertinent to the earlier mass protest, as described by Pedro. Doc. #19 at 3-4 (Mannix Dep. at 9-10). As to other police training, both officers had attended basic peace officer training, as well as in-service training provided by the City. Id. at 2-3 (Mannix Dep. at 4-6, 8-9); Doc. #20 at 3-4 (Pedro Dep. at 6-11).

With regard to the incident in March 2007, Lieutenant Knickle followed up on the same by talking with Officer Pedro and visiting the site in question. Doc. #18 at 5-6 (Knickle Dep. at 17-18). He concluded that the officers had acted in accordance with the City's policies and procedures when they made the arrests in question. Id. at 6 (Knickle Dep. at 19). Soon thereafter, the City provided its police officers with an aerial photograph of the property surrounding the Center. Id. at 5 (Knickle Dep. at 15-16). The City also provided its officers instruction concerning the Center's property boundaries and how they related to making arrests for criminal trespass. Id.

II.    <u>Summary Judgment Standard</u>

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The moving party,

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Id.</u> at 323; <u>see also Boretti v. Wiscomb</u>, 930 F.2d 1150, 1156 (6th Cir. 1991). "Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." <u>Talley v. Bravo Pitino Rest., Ltd.</u>, 61 F.3d 1241, 1245 (6th Cir. 1995); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).  Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations, it is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. <u>Celotex</u>, 477 U.S. at 324.  "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such

that a jury could reasonably find for the plaintiff." <u>Mich. Prot. & Advocacy Serv., Inc. v. Babin</u>, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" <u>Hancock v. Dodson</u>, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. <u>Anderson</u>, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure Civil 3d § 2726 (1998).

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." <u>InterRoyal Corp. v. Sponseller</u>, 889 F.2d 108, 111 (6th Cir. 1989), <u>cert. denied</u>, 494 U.S. 1091 (1990); <u>see also</u> <u>L.S.</u>

12

<u>Heath & Son, Inc. v. AT&T Info. Sys., Inc.</u>, 9 F.3d 561 (7th Cir. 1993); <u>Skotak v. Tenneco Resins, Inc.</u>, 953 F.2d 909, 915 n.7 (5th Cir. 1992), <u>cert. denied</u>, 506 U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . ."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

III.     <u>Analysis of Federal Claims</u>

42 U.S.C. § 1983 provides that "any person who, under color of law, deprives another of a right secured by law 'shall . . . be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress.'" <u>Arendale v. City of Memphis</u>, 519 F.3d 587, 595 (6th Cir. 2008) (quoting <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701, 712-13, 109 S. Ct. 2702 (1989)). There is no question, in the present case, that the officers were acting "under color of law." Thus, the only question for the Court is whether they deprived the Plaintiffs of a right secured by law. With regard to § 1983 claims against municipalities, in order to prevail on such a claim, plaintiffs must show that "the alleged federal right violation occurred because of a municipal policy or custom." <u>Peet v. City of</u>

13

Detroit, 502 F.3d 557, 567 (6th Cir. 2007) (quoting Thomas v. City of

Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005)).


A.    Fourth Amendment Claim Against Pedro and Mannix[5]

The Plaintiffs complain that Pedro and Mannix arrested them for criminal

trespass without having probable cause to do so and, thus, violated their rights

under the Fourth Amendment.  In moving for summary judgment, the Defendants

argue that Pedro and Mannix had probable cause to make the arrests, given

Kaminski's representation that the two were trespassing, along with the officers'

personal observations of the lack of a sidewalk along Wheatland Avenue (and,

thus, the lack of a clearly demarcated public right-of-way). Doc. #12 at 21-22;

Doc. #25 at 6-7.  The Plaintiffs, on the other hand, argue that no probable cause

existed because they were actually in the public right-of-way, in a place they had

been actively protesting for twenty years. Doc. #24 at 9.  The Plaintiffs also

contend that the following "aggravating factors" indicate that the officers lacked

probable cause to make the arrests:  the officers did not inquire of Kaminski about

the basis of his knowledge or authority, and both Gros and Skovgard informed the

officers of their right to protest along Wheatland Avenue and their long-standing

_____

[5]The Plaintiffs have brought identical claims against 1st Choice and Kaminski,
but those Defendants have not moved for summary judgment.  The claims against
the City of Kettering will be addressed later in this Opinion.

practice of doing so.[6] Id. at 10.

The Fourth Amendment forbids "unreasonable searches and seizures", and "this usually requires the police to have probable cause or a warrant before making an arrest." Herring v. United States, 129 S. Ct. 695, 698, 172 L.Ed 2d 496 (2009). According to the Supreme Court, "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe

---

[6]The Plaintiffs list the following as additional "aggravating factors", which the Court has not considered for the reasons noted in the associated parentheticals: "the arrests occurred in the context of abortion clinic protests, where ideological conflict is a given and (if history means anything) accusations require special care" (Plaintiffs provide no factual support regarding the ideological conflict between the parties and no legal support for the stated premise); "the years of regular *lawful* protests at the Kettering clinic . . . was well known to these officers" (Plaintiffs provide no factual support regarding the officers' knowledge that Plaintiffs' previous protest conduct had been lawful); "the antagonist was an over-eager temporary security guard (Kaminski) who did not know the property lines" (probable cause analysis focuses on what the officers knew at the time of the arrests; Plaintiffs provide no facts to indicate that the officers knew Kaminski was an "over-eager temporary" guard or that he did not know the property lines). Doc. #24 at 10 (emphasis in original). The Plaintiffs also argue that that, since criminal trespass is a fourth degree misdemeanor, the officers should have issued a citation to them rather than arresting them. Id. In so doing, the Plaintiffs point to no legal support for their implied proposition that probable cause for an arrest does not exist if an officer has an option to issue a citation rather than making an arrest. Given that the Court knows of no such law, it will also disregard this argument in conducting the present analysis. Finally, the Plaintiffs state that "it would have been all-too-simple for the officers to ask a few basic questions of Kaminski and/or someone at the clinic with actual authority over such matters to determine permissible picketing areas, etc." Id. The Court fails to see how such an inquiry would have been helpful to the probable cause consideration. Kaminski clearly did not know the location of the public right-of-way along Wheatland Avenue. Further, as the Plaintiffs note, the Center's director, Melissa Goode, also did not know the location of the Center's property lines. Id. at 10 n.4 (citing Doc. #14 at 8 (Goode Dep. at 26)). Therefore, this "aggravating factor" is not helpful to the Plaintiffs' position.

that a criminal offense has been or is being committed." <u>Devenpeck v. Alford</u>, 543 U.S. 146, 152, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004). Probable cause exists when "at that moment[,] the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." <u>Beck v. Ohio</u>, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964). The Sixth Circuit summarizes these principles in stating that "[t]he inquiry 'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest,' where supported by 'reasonably trustworthy information.'" <u>Logsdon v. Hains</u>, 492 F.3d 334, 340-342 (6th Cir. Ohio 2007) (quoting <u>Devenpeck</u>, 543 U.S. at 152 and <u>Beck</u>, 379 U.S. at 91). As to the impact on probable cause of the suspect's innocence, the Supreme Court directs that "[t]he validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest." <u>Michigan v. DeFillippo</u>, 443 U.S. 31, 36, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979). Thus, the Court gives no credence to the Plaintiffs' argument regarding their actual innocence of the crime, when conducting its probable cause analysis.

Ohio's criminal trespass statute prohibits persons from "[k]nowingly enter[ing] or remain[ing] on the land or premises of another" without privilege to do so. Ohio Rev. Code § 2911.21(A)(1); Doc. #16, Exs. 3-4 (criminal complaints).

16

Thus, Pedro and Mannix had probable cause to arrest the Plaintiffs if, on the basis of the facts and circumstances known to them, they could reasonably conclude that the Plaintiffs knowingly entered or remained on the Center's property without privilege to do so.

As to the import of Skovgard's and Gros's statements at the scene, regarding their claim to be located within the public right-of-way (which turned out to be accurate), the Sixth Circuit instructs that "the initial probable cause determination must be founded on 'both the inculpatory <u>and</u> exculpatory evidence' known to the arresting officer, and the officer 'cannot simply turn a blind eye toward potentially exculpatory evidence.'" <u>Logsdon v. Hains</u>, 492 F.3d 334, 341 (6th Cir. 2007) (quoting <u>Gardenhire v. Schubert</u>, 205 F.3d 303, 318 (6th Cir. 2000) and <u>Ahlers v. Schebil</u>, 188 F.3d 365, 372 (6th Cir. 1999) (other citations omitted) (emphasis in original)).  However, the Appellate Court also directs that "an officer does not have to investigate independently every claim of innocence." <u>Gardenhire</u>, 205 F.3d at 318.  "But, this axiom does not suggest that an officer has no duty to investigate an alleged crime before making an arrest.  A police officer has probable cause only when he discovers reasonably reliable information that the suspect has committed a crime." <u>Id.</u>

The Plaintiffs argue that the Sixth Circuit's decision in <u>Logsdon v. Hains</u>, 492 F.3d 334 (6th Cir. 2007), indicates that this Court should not grant the Defendants' Motion for Summary Judgment, on the Fourth Amendment claim.  In

17

Logsdon, the Appellate Court reversed the District Court's dismissal of the plaintiff's claims, finding that there was a question as to whether the arresting officers had probable cause to arrest the plaintiff for criminal trespass at an abortion clinic, in Cincinnati, Ohio. In so doing, the Court pointed out that, at the time of the arrest, the officers knew that someone at the clinic had called to report that the plaintiff had trespassed, but that the officers did not witness the alleged trespass and they refused to listen to third parties who had witnessed the incident. Id. at 342. The Court found this last fact particularly telling, noting that the officers "deliberately excluded from a totality of known facts and circumstances information that might bear on the accuracy, reliability, or trustworthiness of the report that Plaintiff had trespassed on CWS's property." Id. "Although our Circuit's precedent 'does not mandate that law enforcement operatives should conduct quasi-trials as a necessary predicate to the warrantless arrest' of suspects, it does require that warrantless arrests follow consideration of the totality of the circumstances reasonably known to the arresting officers." Id. (quoting Painter v. Robertson, 185 F.3d 557, 571 n.21 (6th Cir. 1999)). In conclusion, the Court determined that the Fourth Amendment claim should not be dismissed, because there was "a set of facts consistent with the pleadings in which Defendants violated Plaintiffs' Fourth Amendment rights," given that the officers "off-handedly disregard[ed] potentially exculpatory information made readily available by witnesses on the scene." Id. at 343.

The Defendants, on the other hand, point the Court to Kelley v. Myler, 149

F.3d 641, 647 (7th Cir. 1998), in support of their position.[7]  In <u>Kelley</u>, the plaintiff

was protesting outside a Wendy's restaurant.  A Wendy's employee, Ralph Bell,

called the police and asked that Kelley be removed from the property. <u>Id.</u> at 644.

After observing Kelley's actions, the police arrested her for criminal trespass,

despite her claims that she was on a public easement.[8] <u>Id.</u>  Kelley was later found

not guilty when it was determined that she had, in fact, been on public property.

_____

[7]The Defendants also cite <u>Harper v. Amweg</u>, 2006 U.S. Dist. LEXIS 11343 (S.D. Ohio Mar. 20, 2006), in support of their position.  Given that all parties agreed that the plaintiff, in <u>Harper</u>, was actually trespassing prior to her arrest, the Court finds that case to be too factually dissimilar to the present case to be helpful.

   In <u>Harper</u>, officers arrested Harper for criminal trespass when she was selling homemade buckeye necklaces on property belonging to The Ohio State University. Despite the fact that she was had been twice warned and was arrested when she was, in fact, trespassing on University property, the charges against her were dismissed for unexplained reasons. <u>Id.</u> at **6-7.  Harper then brought suit against the officers claiming they did not have probable cause to arrest her and arguing that she was getting ready to leave the campus when the arrest actually transpired (seemingly immediately after the officers witnessed the transgression). <u>Id.</u> at *16. The District Court found no merit in the plaintiff's argument, however, noting that she had broken the law by continuing to sell necklaces on University property despite direct orders not to do so and, thus, probable cause existed for her arrest. <u>Id.</u> at *17.

   [8]Under Indiana law, which was the pertinent state law in <u>Kelley</u>, a person commits criminal trespass who:

   (1)   not having a contractual interest in the property, knowingly or intentionally enters the real property of another person after having been denied entry by the other person or that person's agent;

   (2)   not having a contractual interest in the property, knowingly or intentionally refuses to leave the property of another person after having been asked to leave by the other person or that person's agent . . . .

<u>Kelley</u>, 149 F3d at 646 (quoting Ind. Code § 35-43-2-2(a)).

Id. Kelley then sued the officers, claiming they had "arrested [her] without probable cause and based on false information provided by Bell." Id. She also claimed that had the officers "done a reasonable investigation they would have realized that she was not on defendant Wendy's property but rather on an easement for the use of the general public, as she had indicated to them." Id. In addressing the issue of whether the officers had probable cause to make the arrest, the Court relied on the rule of law which provides that "[l]aw enforcement officers have probable cause to arrest an individual when 'the facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense.'" Id. at 646 (quoting Sheik-Abdi v. McClellan, 37 F.3d 1240, 1246 (7th Cir. 1994) and citing Beck v. Ohio, 379 U.S. 89, 91, 13 L. Ed. 2d 142, 85 S. Ct. 223 (1964)). In applying this principle, the Court noted the following:

> The officers did not have to first ascertain the location of the property line from official sources in order to determine whether she was in fact on private property. It was sufficient that the officers were informed by Bell that Kelley was on Wendy's property and that he wanted Kelley to leave. We have held that when an officer receives information from a third party whom the officer has reason to believe is telling the truth, the officer has probable cause.

Id. at 647 (citing Gramenos v. Jewel Cos., 797 F.2d 432, 439 (7th Cir. 1986)). The Court also found it significant that the officers had witnessed Kelley's conduct and had asked her to leave, but she refused. Id. Ultimately, the Court concluded

that the officers had probable cause to arrest Kelley for criminal trespass. Id.

Despite the fact that Logsdon was decided by the Sixth Circuit and Kelley by the Seventh Circuit, the Court finds the holding in Kelley to be more helpful to its decision in this case than that in Logsdon. Logsdon is factually distinguishable from the present case in two critical ways. First, the arresting officers in Logsdon did not witness the seemingly unlawful conduct themselves (but, relied upon only the erroneous verbal report from clinic personnel) and, second, the persons who did witness the conduct and to whom the officers refused to listen were third parties (rather than the plaintiff himself).

Kelley, on the other hand, is factually indistinguishable from the present case, in all pertinent regards, and also applies relevant legal principles recognized by the Supreme Court and Sixth Circuit. As in Logsdon, the officers in Kelley were initially (erroneously) informed by a representative of the establishment that the plaintiff was trespassing. Upon arriving at the scene, however, the officers in Kelley actually witnessed the plaintiff's conduct, believing her to be trespassing, and arrested her, despite the plaintiff's (as opposed to a third party's) protestations that she was on public property. In upholding the probable cause determination, the Seventh Circuit relied on the probable cause definition originally set forth by the Supreme Court, wherein probable cause exists when "at that moment[,] the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in

21

believing that the petitioner had committed or was committing an offense." Beck, 379 U.S. at 91. Furthermore, the Seventh Circuit's approach to investigating the suspect's plea of innocence is consistent with the Sixth Circuit's directions that "an officer does not have to investigate independently every claim of innocence," yet his duty to investigate extends to such time as he discovers "reasonably reliable information that the suspect has committed a crime." Gardenhire v. Schubert, 205 F.3d 303, 318 (6th Cir. 2000). As to the Plaintiffs' claims that the officers had a duty to investigate their claims of innocence prior to arresting them, this Court agrees with the Seventh Circuit's stance on this point.

> We refuse to add this extra requirement to the probable cause determination. We have held that if an officer has established cause on every element of a crime, he need not continue investigating in order to test the suspect's claim of innocence. The inquiry is whether an officer has reasonable grounds on which to act, not whether it was reasonable to conduct further investigation.

Kelley, 149 F.3d at 646-47 (citing Gramenos v. Jewel Companies, Inc., 797 F.2d 432, 437-42 (1986), cert. denied, 481 U.S. 1028, 95 L. Ed. 2d 525, 107 S. Ct. 1952 (1987)). Furthermore, this Court finds it compelling that the Fifth Circuit has come to the same conclusion as the Seventh Circuit, in a case that is also factually indistinguishable from the present case. Bodzin v. Dallas, 768 F.2d 722, 725 (5th Cir. 1985) (upholding dismissal of plaintiff protester's claims against police officers, despite jury's verdicts against officers, and, in so doing, stating "[c]ertainly we cannot expect our police officers to carry surveying equipment and a Decennial Digest on patrol; they cannot be held to a title-searcher's knowledge of metes and

bounds or a legal scholar's expertise in constitutional law") (quoting <u>Saldana v. Garza</u>, 684 F.2d 1159, 1165 (5th Cir. 1982), <u>cert. denied</u>, 460 U.S. 1012, 103 S. Ct. 1253, 75 L. Ed. 2d 481 (1983)); <u>see also</u> <u>Paff v. Kaltenbach</u>, 204 F.3d 425 (3d Cir. 2000) (affirming qualified immunity conclusion and finding that reasonable officer would have concluded that plaintiffs were trespassing when, in fact, they were protesting on public property, on post office sidewalk).[9]

In sum, this Court concludes that, based on the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information (e.g., the report from the Center's security guard that the Plaintiffs were trespassing, no facts to indicate that the security guard's report was untrustworthy, the officers actual observation of what appeared to be trespassing conduct, and the fact that the officers had not been trained on public right-of-way boundaries at the Center) were sufficient to warrant a prudent man in believing that the Plaintiffs were committing criminal trespass. Thus, the officers had probable cause to arrest the Plaintiffs. There being no genuine issue of material fact, on this point, the Defendants' Motion for Summary Judgment (Doc. #12) is SUSTAINED, as to the Plaintiffs' claim for violation of their Fourth Amendment

---

[9]This case differs from the present case, in that the New Jersey trespass statute in question had a *mens rea* component, which was the primary focus of the Court's Fourth Amendment consideration. <u>Paff</u>, 204 F.3d at 435 (noting that trespass statue provided that "[a] person commits a petty disorderly offense if, <u>knowing that he is not licensed or privileged to do so</u>, he enters or remains in any place as to which notice against trespass is given by . . . actual communication to the actor" (emphasis added)).

rights, against Mannix and Pedro.

B.    First Amendment Claim Against Pedro and Mannix

The Plaintiffs' Complaint alleges two First Amendment claims, to wit:  (1) deprivation of the Plaintiffs' speech and assembly rights, and (2) retaliation for the exercise of the Plaintiffs' First Amendment rights. Doc. #1 ¶¶ 6.1-6.2.  In their memorandum in opposition to the Defendants' Motion for Summary Judgment, the Plaintiffs concede that they have no factual support for their retaliation claim. Doc. #24 at 14.  Thus, the Court will proceed with an analysis of whether there exists a genuine issue of material fact with regard to whether the officers otherwise violated the Plaintiffs' rights under the First Amendment in the course of their arrests.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble . . . ." U.S. Const. amend. I.  The First Amendment clearly protects a citizen's right to peacefully protest and picket. Edwards v. South Carolina, 372 U.S. 229, 83 S. Ct. 680, 9 L. Ed. 2d 697 (1963); Thornhill v. Alabama, 310 U.S. 88, 60 S. Ct. 736, 84 L. Ed. 1093 (1940).

> It is also true that "public places" historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be "public forums."  In such places, the government's ability to permissibly restrict expressive conduct is very limited:  the government may enforce reasonable time,

place, and manner regulations as long as the restrictions "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."

United States v. Grace, 461 U.S. 171, 177, 103 S. Ct. 1702, 75 L. Ed. 2d 736

(1983) (quoting Perry Education Assn. v. Perry Local Educators' Assn., 460 U.S.

37, 45, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983); some citations omitted)).

In the present case, the Plaintiffs claim that the Defendants' actions in arresting them ran afoul of the rules regarding permissible time, place and manner restrictions. Other than the arrest itself, the Plaintiffs present no evidence that the Defendants imposed "time, place, and manner regulations" on them. Although the officers asked the Plaintiffs to leave the grassy area along Wheatland Avenue, they encouraged them to continue their protests on the sidewalks that ran along the other two sides of the Center. Thus, there is no genuine issue of material fact as to whether the Defendants violated their First Amendment rights. Furthermore, given the Court's previous conclusion regarding the existence of probable cause for the Plaintiffs' arrest, the only way the Plaintiffs' claim can stand is if the law provides that an officer may not make an arrest, even when he has probable cause to believe a suspect has committed a crime, so long as the suspect is participating in constitutionally protected conduct. Such a law does not exist.

Thus, there exists no genuine issue of material fact as to whether the officers retaliated against the Plaintiffs for the exercise of their First Amendment rights or whether the officers otherwise violated the Plaintiffs' First Amendment

rights, in the course of their arrests. Therefore, the Defendants' Motion for Summary Judgment (Doc. #12) is SUSTAINED, as to the Plaintiffs' claim for violation of their First Amendment rights, against Mannix and Pedro.

 

      C.     <u>Fourteenth Amendment Claim Against Pedro and Mannix</u>

The Defendants argue that they are entitled to summary judgment on the Plaintiffs' due process claim, because the Fourth Amendment, rather than the Fourteenth Amendment establishes the protections in the criminal justice system. Doc. #12 at 22-23. The Plaintiffs do not respond.

The Defendants' argument is well taken. In a case wherein the plaintiff argued that, because he was arrested without probable cause, the defendants deprived him of his due process rights under the Fourteenth Amendment, the Sixth Circuit stated,

> [The plaintiff's] reliance on the Due Process Clause is misplaced, however, because it is the Fourth Amendment which establishes procedural protections in this part of the criminal justice area. The Supreme Court has stated that "the Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the 'process that is due' for seizures of persons or property in criminal cases, including the detention of suspects pending trial."

<u>Radvansky v. City of Olmsted Falls</u>, 395 F.3d 291, 313 (6th Cir. 2005) (quoting <u>Gerstein v. Pugh</u>, 420 U.S. 103, 125 n.27, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975)). Given that there is no genuine issue of material fact, on this claim, the

26

Defendants' Motion for Summary Judgment (Doc. #12) is SUSTAINED, as to the Plaintiffs' claim for violation of their Fourteenth Amendment rights, against Mannix and Pedro.

D.   Qualified Immunity

Having found that the Mannix and Pedro did not violate the Plaintiffs' constitutional rights, the Court finds it unnecessary to determine whether the Defendants were entitled to qualified immunity, on the federal claims. See Pearson v. Callahan, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (noting that plaintiffs must show both that their constitutional rights were violated and also that those rights were clearly established, in order to overcome an officer's claim of qualified immunity).

E.   Municipal Liability

As noted above, in order to prevail on a § 1983 claim against a municipality, a plaintiff must "show that the alleged federal right violation occurred because of a municipal policy or custom." Peet v. City of Detroit, 502 F.3d 557, 567 (6th Cir. 2007) (quoting Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005)).  The seminal Supreme Court case pertaining to municipal liability based upon policies and practices is Monell v. Dept. of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  The Sixth Circuit explains the Monell rule,

as follows:

> A municipality cannot be liable for the constitutional torts of its employees; that is, it cannot be liable on a *respondeat superior* theory. Rather, liability will attach only where the plaintiff establishes that the municipality engaged in a "policy or custom" that was the "moving force" behind the deprivation of the plaintiff's rights.

Powers v. Hamilton County Pub. Defender Comm'n, 501 F.3d 592, 607 (6th Cir. 2007) (citing Monell, 436 U.S. at 691, 694). In accordance with this standard, a municipality's failure to properly train its police officers may constitute an actionable municipal policy, under § 1983, in certain instances. City of Canton v. Harris, 489 U.S. 378, 388-89, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)). Similarly, the Sixth Circuit has recognized that, in certain instances, a failure to investigate an incident and punish the responsible officers (i.e., ratifying the officer misconduct) may also constitute a policy that is actionable under § 1983. Leach v. Shelby County Sheriff, 891 F.2d 1241, 1248 (6th Cir. 1989).

Both theories of liability are based on the Supreme Court's admonition that such inadequacy "may serve as the basis for § 1983 liability only where the failure . . . amounts to deliberate indifference to the rights of persons with whom the police come into contact." Harris, 489 U.S. at 388-89 (noting that this rule is consistent with its holding in Monell that "a municipality can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation'" and further noting that "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights

28

of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983").  Further, municipal liability attaches "only where . . . 'a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers." Id. at 389 (quoting Pembaur v. Cincinnati, 475 U.S. 469, 483-84, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)). "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality -- a 'policy' as defined by our prior cases -- can a city be liable for such a failure under § 1983." Id.   Finally, a claim of failure to properly train cannot be based on simple negligence. Leach v. Shelby County Sheriff, 891 F.2d 1241, 1246 (6th Cir. 1989).

> [A] failure of a supervisory official to supervise, control, or train the offending individual [employees] is not actionable absent a showing that the official either encouraged or in some way directly participated in it.  At a minimum a plaintiff must show that the official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending [employees].

Id. (quoting Hays v. Jefferson, 668 F.2d 869, 874 (6th Cir. 1982)). In the present case, there is no evidence that City officials directly participated in or encouraged the alleged deprivations of the Plaintiffs.  The Plaintiffs do, however, claim that the City implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the arresting officers, or, in other words, that it had two policies or customs that were the moving forces behind their injuries, to wit: (1) the City failed to properly train its officers, as to trespass boundaries at the Center; and (2) the City failed to discipline the officers for their misconduct (i.e., it "ratified" their

29

misconduct).[10]  The Court will look at each of these claims in turn.

    1.    <u>Failure to Train</u>

As noted above, a city will be liable for injuries sustained as a result of its actions, under § 1983, if a plaintiff shows that the municipality had a custom or policy of systematically failing to train its employees adequately, such that the "failure to train amounts to 'deliberate indifference' on behalf of the city toward its inhabitants." <u>Gregory v. City of Louisville</u>, 444 F.3d 725, 753 (6th Cir. 2006) (quoting <u>City of Canton v. Harris</u>, 489 U.S. 378, 389, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)).  As explained by the Supreme Court, in <u>City of Canton v. Harris</u>,

> The issue . . . is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy."  It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees.  But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been <u>deliberately indifferent</u> to the need.  In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be

---

[10]The Plaintiffs also seem to be arguing, as a separate means of establishing liability, that the City should be found liable because "Pedro and Mannix acted according to City policy." Doc. #24 at 19.  Although, as discussed above, a plaintiff can establish municipal liability by demonstrating that a municipality has an unconstitutional policy, the plaintiff cannot establish liability simply by demonstrating that an officer acted according to a municipal policy.  Thus, the Court will focus only on the Plaintiffs' arguments pertaining to the failure to train and failure to discipline.

held liable if it actually causes injury.

Canton, 489 U.S. at 390 (footnotes omitted) (emphasis added). The Sixth Circuit instructs that to succeed on a failure to train claim, a plaintiff must prove the following: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." Ellis v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700 (6th Cir. 2006) (citing Russo v. City of Cincinnati, 953 F.2d 1036, 1046 (6th Cir. 1992)).

As to deliberate indifference, the Sixth Circuit notes that there are "at least two types of situations that would justify a conclusion of deliberate indifference in the failure to train police officers." Brown v. Shaner, 172 F.3d 927, 931 (6th Cir. 1999). "One is failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction. . . . A second type of situation justifying a conclusion of deliberate indifference is where the city fails to act in response to repeated complaints of constitutional violations by its officers." Id. (citing Canton, 489 U.S. at 390). In the present case, there is no evidence that the City failed to act in response to repeated complaints of its officers erroneously arresting persons for criminal trespass who were in the public right-of-way adjacent to the Center, prior to the incident with Gros and Skovgard. Because the incident in question was an isolated incident, the appropriate question is whether the City failed to provide adequate training in light of foreseeable consequences that could

result from the lack of instruction.

The Supreme Court has provided guidance as to this requirement in two cases. As previously noted, in <u>Canton</u>, the Court stated that "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." <u>Canton</u>, 489 U.S. at 390. Following that decision, in <u>Board of the County Commissioners of Bryan County, Oklahoma v. Brown</u>, 520 U.S. 397, 409, 117 S. Ct. 1382, 137 L. Ed. 2d 62 (1997), the Supreme Court explained that <u>Canton</u> "did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." <u>Brown</u>, 520 U.S. at 409 (citing <u>Canton</u>, 489 U.S. at 390and n.10).

In <u>Canton</u> (and as cited in <u>Brown</u>), the Court provided the following example of when such a single violation could trigger § 1983 liability:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

<u>Canton</u>, 489 U.S. at 390 n.10 (citing <u>Tennessee v. Garner</u>, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).  In <u>Brown</u>, the Court further noted that a plaintiff may succeed in demonstrating an actionable failure to train claim without showing a pattern of constitutional violations in only a "narrow range of circumstances."

> In leaving open in Canton the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.  The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice--namely, a violation of a specific constitutional or statutory right.

<u>Brown</u>, 520 U.S. at 409.[11]  Thus, in order to demonstrate the second prong of the failure to train claim (absent a showing of a pattern of constitutional violations), plaintiffs must set forth facts to indicate that there was a "likelihood that the situation would recur" and that is was predictable "that an officer lacking specific tools to handle that situation would violate citizens' rights." <u>See</u> <u>id.</u>; <u>see also</u> <u>Brown v. Bryan County</u>, 219 F.3d 450 (5th Cir. Tex. 2000) (while recognizing that "a single decision by a policy maker may, under certain circumstances, constitute a

---

[11]As to the causation requirement for proving municipal liability under a failure to train claim, the Court further notes that "[t]he high degree of predictability may also support an inference of causation--that the municipality's indifference led directly to the very consequence that was so predictable." <u>Brown</u>, 520 U.S. at 409-10.

policy for which the County may be liable," noting that the "evidence must establish, under the stringent standards of the Supreme Court's pronouncements in [Brown], unmistakable culpability . . .").

Now that the Court has set forth the requirements of a § 1983 failure to train claim, it returns to the foundation for such. In order for a plaintiff to prevail on a claim for failure to train, he must prove both that he sustained a harm as a result of a constitutional violation and that the government is responsible for that violation (e.g., as a result of a failure to adequately train its employees).[12] Collins v. City of Harker Heights, 503 U.S. 115, 120, 112 S. Ct. 1061, 1065, 117 L. Ed. 2d 261 (1992). "[P]roper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." Id. (citing Oklahoma City v. Tuttle, 471 U.S. 808, 817, 828-29, 85 L. Ed. 2d 791, 105 S. Ct. 2427 (1985)). Therefore, before this Court can turn to an analysis of whether the City of Kettering is responsible for its failure to adequately train Pedro and Mannix, it must revisit the question of whether City employees violated any of the Plaintiffs' constitutional rights.

As decided above, the Plaintiffs have not set forth sufficient evidence to create a genuine issue of material fact on any of their constitutional claims against

---

[12]In Canton, the Supreme Court assumed that the plaintiff's constitutional rights had been denied and, thus, limited its opinion only to the question of whether the deprivation was attributable to a municipal custom or policy. Canton, 489 U.S. at 389 n.8.

Officers Pedro or Mannix.  As such, the Court has concluded that they have sustained no injury as a result of a constitutional violation.  Thus, they have no basis for a claim against the City for failure to train.

With regard to the Fourth Amendment claim, the Court recognizes the seeming unfairness of this conclusion, given its probable cause conclusions set forth above, which relied, in part, on the fact that the Officers had not been trained about the location of the Center's property lines (and, thus, had no reason to question the security guard's assertion that the Plaintiffs were trespassing).  It is this Court's understanding of Supreme Court jurisprudence, however, that there are no exceptions to the requirement that a plaintiff must first demonstrate a constitutional deprivation prior to a court's consideration of a failure to train claim. See Collins, 503 U.S. at 120. Thus, given that there is no genuine issue of material fact as to whether the Plaintiffs have sustained a constitutional deprivation, at the hands of a City employee, there is also no genuine issue of material fact as to whether the City is liable to the Plaintiffs for failing to adequately train its employees.  Thus, the Defendants' Motion for Summary Judgment (Doc. #12) is SUSTAINED, as to the Plaintiffs' claim against the City of Kettering for failure to train.

2.    Failure to Discipline/Investigate ("Ratification")

The Plaintiffs also claim that the City is liable to them for its failure to

35

discipline Pedro and Mannix and/or properly investigate their wrongdoing, as to the incident in question. Doc. #1 ¶¶ 4.10, 4.11 (Case #3:09cv082). As noted above, in order to find a municipality liable under § 1983, a plaintiff must demonstrate that the municipality had a policy or custom that renders it responsible for the damages found. Leach v. Shelby County Sheriff, 891 F.2d 1241, 1245 (6th Cir. 1989). The Sixth Circuit has found that "a failure to investigate complaints or discipline officers can give rise to § 1983 liability. Dyer v. Casey, 1995 U.S. App. LEXIS 37042, **4-5 (6th Cir. Dec. 4, 1995) (citing Marchese v. Lucas, 758 F.2d 181, 188 (6th Cir. 1985); Leach v. Shelby County Sheriff, 891 F.2d 1241, 1247 (6th Cir. 1989)[13]). "The theory underlying these cases is that the municipality's failure to investigate or discipline amounts to a 'ratification' of the officer's conduct." Id. at *5. Furthermore, courts have concluded that although a failure to

---

[13]The Court notes that some District Courts have cautioned that these cases should not be read so broadly as to indicate that the failure to investigate, in and of itself, amounts to a constitutional violation (just as with the failure to train analysis above). E.g., McGuire v. Warner, 2009 U.S. Dist. LEXIS 35644, **21-22 ( E.D. Mich. Apr. 28, 2009); Hysell v. Thorp, 2009 U.S. Dist. LEXIS 11597, **63-64 (S.D. Ohio Feb. 2, 2009). The concern is that "Monell forbids a finding of county liability except where the misconduct is pursuant to an official policy or custom and is also the 'moving force' behind the plaintiff's injury." Tompkins v. Frost, 655 F. Supp. 468, 472 ( E.D. Mich. 1987). Thus, "[w]rongful conduct after an injury cannot be the proximate cause of the same injury." Id. Rather, the courts suggest, the Sixth Circuit cases should be read to hold that "a post-injury failure to investigate [is] a fact which may permit an inference that the misconduct which injured the plaintiff was pursuant to an official policy or custom." Id. (emphasis added).

As further discussed infra, this Court finds that the facts, as set forth in the present litigation, are insufficient to support a finding that the City failed to investigate or discipline the officers in question. Thus, it is unnecessary for the Court to further address the concerns regarding the scope of the applicable Sixth Circuit's holdings.

conduct an investigation into a claim of unconstitutional conduct may permit an inference that the municipality has an official policy or custom of tolerating such conduct, "standing alone, it is not enough to establish liability." Hysell v. Thorp, 2009 U.S. Dist. LEXIS 11597, *63 (S.D. Ohio Feb. 2, 2009); see also Morrison v. Bd. of Trs. of Green Twp., 529 F. Supp. 2d 807, 825 (S.D. Ohio 2007) ("[I]nferring a municipal-wide policy based solely on one instance of potential misconduct runs dangerously close to 'the collapsing of the municipal liability standard into a simple respondeat superior standard.'") (quoting Morrison, 529 F. Supp. 2d at 825).

The Sixth Circuit has published two seminal cases addressing municipal liability, under a failure to investigate or discipline ("ratification") theory, Leach v. Shelby County Sheriff, 891 F.2d 1241 (6th Cir. 1989), and Marchese v. Lucas, 758 F.2d 181 (6th Cir. 1985). In Leach, a paraplegic inmate had received inadequate medical treatment during his incarceration. The Sixth Circuit found that the sheriff's failure to investigate the incident involving the inmate's medical care and punish the responsible parties (along with a finding that "at least 14 other paraplegics had received similar deplorable treatment") were "evidence of a policy of deliberate indifference". Id. at 1248. The Appellate Court ultimately concluded that because the sheriff "took no action to correct the situation nor to discipline [the employee responsible] for the mistreatment", he in essence "ratified the unconstitutional acts" and such ratification was deemed sufficient to attach liability to the county. Id.

In Marchese, a prisoner was severely beaten twice while in custody. In finding that the county had a policy of deliberate indifference for which it could be found liable under § 1983, the Appellate Court pointed out that "[n]ot only do the facts show that there was official toleration[] (if not complicity in instigation) of the midnight assault on the part of the command officers on duty at the station house that night; but there was also subsequent concealment followed by a complete failure to initiate and conduct any meaningful investigation on the part of the Sheriff himself." Marchese, 758 F.2d at 187-88.

The present case differs factually from Marchese and Leach in one critical aspect. In those cases, there was "no serious investigation" conducted, as a result of the incident in question. Id. at 188; see also Leach, 891 F.2d at 1248 (noting no investigation had taken place); Walker v. Norris, 917 F.2d 1449, 1457 (6th Cir. 1990) (affirming directed verdict for defendants, based in part on fact that defendant prison had investigated and taken action, as a result of incident in question, specifically noting the contrast to the facts presented in Marchese). In contrast, in the present case, the City took steps to investigate the situation and then to train its officers on trespass/boundary issues at the Center, after the incident with the Plaintiffs. Further, there are no facts presented to indicate that punishment was warranted, given that Pedro and Mannix had never been trained on trespass/boundary issues at the Center prior to March 2007, and, thus, could not be found at fault, as to their conduct involving the Plaintiffs. Therefore, the City cannot be found liable under a failure to investigate or discipline ("ratification")

theory.  Even if there were sufficient facts on the record to indicate the City failed to investigate or discipline the arresting officers, as previously noted, such a one-time failure, standing alone, would be insufficient to establish liability. <u>See</u> <u>Morrison v. Bd. of Trs. of Green Twp.</u>, 529 F. Supp. 2d 807, 825 (S.D. Ohio 2007).

Given that there is no genuine issue of material fact, on this claim, the Defendants' Motion for Summary Judgment (Doc. #12) is SUSTAINED, as to the Plaintiffs' claim for failure to discipline or punish ("ratification"), against the City of Kettering.


IV.    <u>Analysis of State Claims</u>

The Plaintiffs also bring claims against Mannix and Pedro for false arrest, false imprisonment and malicious prosecution. Doc. #1 at 7.  In their Motion for Summary Judgment, the Defendants contend that they are entitled to immunity for such claims, under Ohio Revised Code Chapter 2744.

The pertinent part of Chapter 2744 provides that an employee of a political subdivision is immune from liability unless one of the following applies:

(a)  The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

(b)  The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; [or]

(c)  Civil liability is expressly imposed upon the employee by a section of the Revised Code. . . .

Ohio Rev. Code Ann. § 2744.03(A)(6).  The parties agree that the relevant

provision in this case is subparagraph (b), which necessitates a showing that the

acts or omissions of Pedro and Mannix were "with malicious purpose, in bad faith,

or in a wanton or reckless manner."

As another District Court in Ohio has summarized, with regard to the

application of this provision,

> "Malice" is the willful and intentional design to do injury or the
> intention or desire to harm another, usually seriously, through conduct
> which is unlawful or unjustified. "Bad faith" involves a dishonest
> purpose, conscious wrongdoing, the breach of a known duty through
> some ulterior motive or ill will, as in the nature of fraud, or an actual
> intent to mislead or deceive another.  "Wanton misconduct" is the
> failure to exercise any care whatsoever.

Morrison v. Bd. of Trs., 529 F. Supp. 2d 807, 835 (S.D. Ohio 2007) (citing Cook v.

Cincinnati, 103 Ohio App.3d 80, 90-91, 658 N.E.2d 814 (Ohio App. 1995)).  The

Plaintiffs have set forth no facts to indicate that Pedro or Mannix acted with a

malicious purpose, in bad faith, or in a wanton or reckless manner.  Because there

is no genuine issue of material fact, on this point, the Defendants are entitled to

immunity under Ohio Revised Code Chapter 2744.  Therefore, the Defendants'

Motion for Summary Judgment (Doc. #12) is SUSTAINED, as to the Plaintiffs'

claims for false arrest, false imprisonment and malicious prosecution, against Pedro

and Mannix.

V.      Conclusion

Defendants' Motion for Summary Judgment is SUSTAINED, in its entirety.[14]

Doc. #12. Judgment is ultimately to be entered on behalf of Defendants Pedro, Mannix and the City of Kettering.

All claims against Defendants Kaminski and 1st Choice remain viable, as neither of these Defendants has moved for summary judgment. Plaintiffs should advise this Court, within ten (10) calendar days, as to whether they wish to proceed against these two remaining Defendants. If so, a scheduling conference will be convened to set a new trial date and other dates leading to the resolution of this litigation. In not, these remaining Defendants should be dismissed with

---

[14]The Defendants also moved for summary judgment on the issue of whether the Plaintiffs were entitled to an award of punitive damages against Officers Pedro and Mannix. Doc. #12 at 32. Given the Court's decision hereunder, in favor of Pedro and Mannix on all claims asserted against them, the Court need not address the question of punitive damages.

prejudice, in order that final judgment might be rendered on this decision and an appeal taken therefrom.


February 10, 2010


  /s/  Walter Herbert Rice          
WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT


Copies to:
Counsel of record